Good morning everyone. The first argued case this morning is under Codding 12-7092 McCulley v. Department of Veterans Affairs, Mr. Wells. Thank you, Your Honor. You may please record. Congress established the VA Benefit System to be veteran-friendly, to be non-adversarial, to take care of the folks that have gone out there and fought and to take care of their widows and their children. The VA will tell you, as the appellee noted in their brief, that that's what the system is. We can't make things too technical or allow too much to be processed because that would underwrite for some reason or weaken that non-adversarial relationship. The problem is, it's the most adversarial system going right now. As I mentioned in the reply brief, people who deal with the system every day testified before Congress, including the judge of the Court of Appeals for Veterans Claims, says it's adversarial. At a certain point, I think we need to either hold the VA to the standard which Congress requested or we need to just stop ignoring the facts and claiming it's non-adversarial. What I hear you saying is that if the veteran states that a certain disability is service-connected, that's not subject to challenge? It is subject to challenge, Your Honor, but it's supposed to be done under certain conditions. First of all, the VA has the duty to assist. Secondly, the application of the benefit of the doubt rule. Thirdly, as Congress has set it up, if we have a balance of the evidence, a jump ball, if you were in basketball terms, it goes to the veteran. That's not what happens. In this case, which has been ongoing for a decade now, it's probably one of the best examples of that. In the duty to assist, and as you all know, it's been fairly recent that attorneys have been able to get involved in any kind of level. I got involved in this one. It was actually the first VA case I ever got involved with, not long after I retired from the military. We look to try to get the information that we need to mount a challenge. Just as the service connection or the disability is subject to challenge, the findings of the VA, especially the medical findings, should be subject to challenge. In this case, we asked to first of all depose, or at least get the curriculum vitae of Dr. Santos, who had thrown his hands up and said, I can't make a decision. We were denied that. There's no place in the statute for that. Were you involved at the time of death, Mr. Wilkes? I was not. I came into it after the initial Board of Veterans' Appeals decision. It's unfortunate that there was no autopsy. It might have answered a lot of questions. You're exactly correct. I think we brought this up at the last Board of Veterans' Appeals hearing. Ms. McCauley was just asked, will you consent to an autopsy? There was nothing provided to her that says, we need this to establish a cause of death. All the doctors at the time, and we reproduced this testimony in the Joint Appendix, had told her he died of lung cancer. Nobody said to her, and Ms. McCauley is a widow, she's not a lawyer, she's not a doctor, she's just a normal human being. Nobody told her, we need to do this to establish cause of death. And she just did not want him cut on, basically, is what it came down to. But the problem was, there was a biopsy that everybody agreed it needed to be done, and it was never done. I appreciate the unfortunate fact that the biopsy didn't occur. What's the lay of the land going forward? Aren't we in a position now where we would be unable, assuming even for purposes of argument, that the veteran died from lung cancer? The cancer needs to be primary as opposed to metastatic, right? It does. However... My understanding was that you would need a biopsy in order to make that assessment. Well, you know, that's what Dr. Santos said, and that's one of the reasons why we wanted to look at Dr. Santos' qualifications and talk with him. As it was... But isn't that a matter of medical arts? I mean, if one were able to say with certainty that the cancer was primary without, on this record, without the benefit of a biopsy, I think we would have said that already. But he never got to that. What? Well, Dr. Santos... You haven't made that, you haven't made that avertment. Well, yes, sir, and if you give me about a second, I'll try to get to that. 2002, there was a... Well, let me back up just a little bit. 1984 was his original neck, tongue, squawk, and I'm going to mispronounce this, some type of cell cancer, okay? The job they had in 2002 is when they started finding new lesions, which they'd never found before, on the lungs. And in that actual document, and the BVA, the Board of Veterans Appeals, recognized that, and it's in the Joint Appendix, I believe, it's at, yeah, at page 10, it says, you know, there was new lesions and a possibility it was primary cancer, okay? Jumping ahead to 2004, that's when the first doctor that reviewed this says, it's at least as likely as not, that it was metastasized. That brings it to 50%. To the jump ball that I talked about earlier, which should go to the veteran. That's why we remanded it to get that other opinion. Now, Dr. Santos comes and says, I can't make that determination, because even though it's the likely cause of death, even though I think it's the cause of death, I personally, Dr. Santos, need a biopsy. And that's, there's no medical protocol that I know of, and we did ask to see... It goes back to Santos, and they're saying then, at this stage in the game, they're asking him to ascertain whether or not the cancer was primary or metastatic, right? Right. He says he can't get to that. And therefore, he can't get to the other question as well. He said that. Yes, sir. So he's there looking at a record, right? He's looking at a record. And the record is inconclusive as to whether or not the lung cancer was the cause of death. Your Honor, I would respectfully disagree on that, because what the record showed was... That's what I thought. Correct me if I'm wrong. What's the data point that says conclusively that... It doesn't say conclusively. It never says conclusively. But he never says it wasn't lung cancer. He said in his... Who's the he now? Santos. He said that it was most likely cause... So what I'm trying to get at is, as of the time that the veteran died, I looked at the death certificate. I didn't see there was a... No, it said probable lung cancer. I would ask you to consider starting a joint appendix 35A. All I'm trying to do with this is to put Santos in... Try to get at the position Santos was in when he was asked what... Saying, well, let's assume for purposes of argument that the cause of death was cancer. Tell us whether or not it was primary or metastasized. And his personal... And again, we did ask to look at the treatises he relied on. We're not given those. His personal conclusion was he couldn't make the initial decisions to whether it was lung cancer or not without the biopsy. Subsequently, the Court of Veterans Appeals and Judge Davis... And perhaps I was more confused than he was. He gave you the benefit of the doubt on the cause of death. That's right. Yeah, no question about that. And so based on that, he should have gone back down and said, all right, you've got to assume it was lung cancer. Give us a reason. Can I sort of cut to work just so you know where I am on this? Sure. Okay. You're arguing that there's a due process right for you to have access to Dr. Santos. I'm arguing that that's under the duty to assist in due process. Well, that's right. I mean, it's a failure of the duty to assist, but because you had a due process right, you had it, right? Right. And so then what we are is we're sort of in the heart of the Gambill case. Yes, sir. And in the Gambill case, a very similar problem arose about a veteran who wanted to get active inside a doctor's line. And the question was whether or not we could do that. Our panel split, as you know, in that case, and we had one judge who felt that there was a constitutional right and one that felt there wasn't. But the entire panel unanimously said, even if there is a constitutional right, it's subject to a harmless error analysis. Right. And they ran the harmless error analysis, and they said, well, even if the party had been granted right to what they were trying to get as a matter of constitutional due process, had they got it, it wouldn't have done them any good. Right. Now, so I think what you have to do here is to say, even if Santos was taken out of the case, for example, if you were to be able to get inside of Santos and say his opinion isn't what the paper's written on as a matter of law, then you're left with a record in which there is, as I understand it, the government's argument, there is a key data point saying that it's more likely as not metastasized. Yes, sir. As likely as not. Mr. Wilson, when you say the party opposed, so it can be repeated. I apologize. How can you improve your case by getting rid of Santos? Because if we get rid of Santos, we default to the 2004. They said it's at least as likely as not that it's metastasized. But the standard is they have to show that it's more likely or not. The at least likely or not goes to the veteran. At least likely or not, we're at 50%. That means the veteran's at 50%. Ties go to the veteran on a jump ball situation. That's the whole application of the benefit of the doubt rule. If we get rid of Santos, we either win or we have to go back for a remand. And, Judge, I'm into my rebuttal time. I just want to make sure you understand the data points I'm looking at. Sir. Your representative got access to Santos. He got access for a very few minutes. He got access to Santos. I didn't get access. I know you didn't. And, you know, my investigator said, we talked to a lawyer. No, no, no. I'm going to tell you. The point is we don't know the circumstances under which why there wasn't a more fulsome exchange with Santos. But you are asking for access to Santos. And your client got it. We're asking for better access. And we're asking for the CV and the treatises that we had to rely on, Judge. Because part of the problem was, first off, he would not talk with me. Secondly, But you weren't involved. Were you involved? It was my investigator's fault that he would not talk with me. He said he was going to talk to my investigator. So he did not want to get into the type of deposition that I wanted to get into. At least that's what he told my investigator. But the problem is, even if you look at what Santos said in his opinion, he said it's the most likely cause of death. And even what he told my investigator is, you know, he just needed that biopsy to go to final steps. He said it's very likely. He's about everything except, yes, it was, and he needed that biopsy. Judge, I'm into my rebuttal time. I'm sorry. We'll save your rebuttal time. Okay, let's hear from this. Thank you. Thank you, Mr. Williams. Ms. Case Miller. Thank you, and may it please the Court. We agree that this case is in the heart of gamble. If we initially set aside the waiver of the due process issue and our arguments regarding the fact that this isn't truly raising a due process claim, but merely putting a due process label on the duty to assist claim, but even setting aside those initial procedural arguments, looking at the merits of the due process claim, we are in the heart of gamble. This is very much a factual setting, exactly like this Court looked at in gamble and said ultimately because there was no harmless error there, it wasn't necessary to reach these due process questions. Like the medical opinion in gamble, Dr. Santos' 2000 opinion did not leave Mrs. McCulley any worse off. It didn't help her claim, and it didn't hurt her claim. The doctor said I don't have the information, a biopsy or an autopsy necessary to make this determination on what the Veterans Court rightly called the determinative issue here, and that is not whether Mr. McCulley had lung cancer, but whether that lung cancer originated in the lungs. That is whether it was primary or a metastasis from another area. Mrs. McCulley acknowledges that she in fact got access through her investigator to the doctor. The investigator asked questions and in turn testified to the board  The record also contained evidence establishing that Dr. Santos is the chief of oncology and hematology at the Veterans Medical Center. Do we have Dr. Santos' testimony before the board in the record we have here, ma'am? I believe so. Excerpts from the testimony are around page 40. I know that Mrs. McCulley's testimony is in here.  I see Wells, Chairman Wells. I wasn't certain that I'd actually seen testimony by Dr. Santos. I'm sorry to interrupt, Your Honor. It's page 43 of the appendix, the longest paragraph on that page. This is the complete investigator's testimony. He said he spoke with Dr. Santos. Oh, so it's the investigator testifying. Dr. Santos himself did not testify. Oh, excuse me. I misunderstood. I understood you to say that Dr. Santos testified. I apologize. The investigator testified to the board about the conversation that he had with Dr. Santos by telephone. Despite having had that opportunity to directly ask questions, Mrs. McCulley still has not raised any challenge to the competency of Dr. Santos. Can I ask you a question about that? Was there any objection by the veteran here to the investigator's access to Santos, whether it was incomplete or was there at the board level or at the CAVC level, was there any argument being made that although Santos had been provided, that was an inadequate provision? Do you see what I mean? Yes, Your Honor. And page 12 of the Veterans Court decision addresses that argument. And this is what McCulley did make. She said, as the Veterans Court summarized it, VA violated its duty to assist by ignoring requests to facilitate an interview with the 2011 Veterans Court. What page is that in the joint appendix? Page 12. Page 12 in the joint appendix? Yes, Your Honor. Starting at the very top of the page. You see the title for that section is at the bottom of the previous page. So the Veterans Court considered these arguments, applied the statutory duty to assist to the facts of this case, and found that there had been no violations. And that, of course, application of law to fact is beyond this Court's jurisdiction to review. The Court has asked, if the Santos opinion were not part of this record, how would the claim have been adjudicated? And the answer is it would have been adjudicated precisely the same way that it was adjudicated here, because Dr. Santos' opinion was neither evidence to help substantiate the claim, nor was it evidence against the claim that was used to undermine it. It isn't quite that adverse, is it? He says that, again, the page he directed us to, page 43 of the joint appendix, the size of the mass in the chest was certainly indicative of lung cancer. It could have been the cause of death, but because of the lack of biopsy, he could not officially prescribe lung cancer. Doesn't that lay on the side of at least there's an equal likelihood, if not more likelihood, of lung cancer, in which case the benefit of the doubt rule would overtake the other issues that we've been debating here? As to the question whether Mr. McCulley actually had lung cancer, yes, Your Honor, is correct. Well, we don't know. I mean, everybody agrees that we don't know. He died, and there was no biopsy, and so we don't know whether he actually had it. This is all we have. I'm just looking as to where, in view of the benefit of the doubt rule, and there certainly is a weight, however slight or heavy it might be, in what Dr. Santos is reporting to have said. Said there's a mass, looks like lung cancer, there's no biopsy. So he says he could not officially prescribe lung cancer. That's just a prudent physician saying things as they are. He's also saying what he can't say is whether it metastasized or not. Doesn't have to. From the squamous. Does he? I guess it's lung cancer that's necessary. Yes. Aren't the data points that the CAVC gave the veteran the benefits of doubt on whether or not the death was caused by the lung cancer? The CAVC opinion went through that issue and said the BVA screwed up. They should have given benefit of the doubt. That's right. There are two separate and distinct issues here. First, whether Mr. McCulley actually had lung cancer. And using this evidence that Your Honor has pointed to, the Veterans Court found that the benefit of the doubt applied, that the board had erred by failing to apply it and therefore applied the benefit to find that he did have lung cancer. But the second issue, which is necessary under the presumption, is that that cancer has been primary as opposed to metastatic. Because only the primary cancer has been established to show the necessary link to Agent Orange exposure in Vietnam. If the true cause of the cancer was metastasis from Mr. McCulley's smoking-related tongue, neck, mouth cancer. Now, is it actually that rigorous? What we're really saying is it's sort of like a table injury with the presumptions if certain circumstances arise. But it doesn't mean that there are contrary presumptions if the evidence is ambiguous. Importantly, Your Honor, the evidence here as to the metastasis question is not simply ambiguous. The board made a factual finding at page 31 of the record that more of the evidence here indicated that it was likely metastatic. And although Mrs. McCulley attacks that finding in her reply brief saying that it's completely unsupported by anything in the record, the board's opinion went through each piece of evidence and pointed to several specific pieces of evidence that support a finding that the cancer was metastatic. For example, a March 2002 inpatient record that was, quote, very likely metastatic. The board mentioned that decision on pages 25 and 27. Also on page 27 of the board's opinion, or rather page 27 of the joint appendix, the board referenced a January 2002 x-ray, which the x-ray examiner said was suspicious of metastatic disease. So looking at all of this evidence, Dr. Sampson... Looking at all of the evidence, it's a closed question. Now we get to the benefit of the doubt rule. Respectfully, Your Honor, the board found to the contrary. The board did not, and this is a finding of fact, the board did not find that the evidence was 50 percent for and 50 percent against the claim. If it were 50-50, we probably don't need the benefit of the doubt rule. Here we're talking about where the evidence isn't quite so clear, but could, in fact, have caused the disability. No, Your Honor, the board made a factual finding here that more of the medical evidence, in other words, more than 50 percent of the evidence, showed that the cancer was metastatic. Isn't the benefit of the doubt rule specifically for the 50-50 situation? Yes, Your Honor, the statute uses the word equipoise. When the evidence is in equipoise, then the doubt is resolved in favor of the veteran, and that is not the situation that we have here. Rather, again, there's the factual finding that Mr. McCullough... Is that in the statute, that you give the benefit of the doubt when the evidence is in equipoise? Yes, Your Honor, the equipoise is the language that the statute uses. So it has to be, you have to have a 50 percent chance of the event having occurred, then you're talking not about the benefit of the doubt, you're talking about a presumption. Well, we have two separate issues here. First, the presumption does not apply if Mr. McCullough's lung cancer was metastatic. As to the question whether it was metastatic, the board found that the evidence was more heavily in favor of it being metastatic. It was not in equipoise. So we have both of those issues that were under consideration in this case. Those are fact findings? Yes, Your Honor. Factual findings, of course, beyond this court's jurisdiction to review. So for these reasons, we ask that the court affirm the decision level. Okay, thank you. Mr. Wells. Your Honors, may it please the court, I would ask you to look at Joint Appendix 66 when you have a moment, which is the 2004 opinion from Dr. Lemaire, which kind of got us off on this whole thing and about the third sentence, third one down. Joint Appendix 66? Joint Appendix, I'm sorry, 124. I apologize, Judge, I gave you the wrong one. I gave you the 2007 one. Yes, you did. And on the third sentence down, it says, Therefore, it is least as likely as not that the carcinoma was metastatic. I don't do well with medical terms. That's what brought us to the 50%, Judge. And Judge Newman is right. If we're at 50% on the original question of metastatic, the benefit of the doubt rule comes into play. That's one data point. That's the data point. But there are other data points on the subject of whether or not it was more likely than not metastatic. Yes, sir. This was the one that caused the original remand. And we came back. Right. And we're looking at the whole record. Yes, sir. Okay, good. We came back and did the original remand because of this so that we could get off of the 50% and have it go, the scales won't wear enough. Dr. Santos didn't do what he was asked to do. He didn't answer the mail. He was asked to make a determination as to whether it was more likely or not to be metastatic or primary, and he never got that. So as you pointed out, Judge, I'm sure if we take Santos out of the picture, we're back to the 2004 50-50 jump ball. Plus 2002 and other. But even in 2002, there was indication of new lesions and a possible primary lung cancer. I believe the Board of Veterans' Appeals found that on, and it was either joint appendix 10 or 11. I forget which page it was. Go back to 124. Certainly. Joint appendix. What's your point on this? Okay, third sentence. So at least as likely as not the carcinoma was metastatic. That's saying 50% chance of metastatic. The other 50%, there's no opinion on it. It's either 50-50. He says it's at least as likely as not that there was metastasis. And those are magic words, because that brings it to the 50% point. And if it's 50% that it was metastatic, it's 50% that it was not. That's what caused the confusion. That's why we did the first remand. Because, again, those are magic words. You sort of resuscitated the benefit of the doubt rule here during the oral argument. That's not really what your brief's all about. Actually, I did mention in the briefs that... You know what I'm talking about. Yes, sir. We've moved to a new ground, really. Roger that, sir. Sorry, I slipped into military terminology, so it's a bad habit. No disrespect, ma'am. And I guess that's the point that I've been trying to make. If we take Santos out of the picture, we're still back at the jump ball. Jump balls go to the vets. That's another reason why, you know, in a stretch of rice and sand and gimble, there may be times when we need to confront the doctor. And I think this is why we really needed to confront him at this time. Again. I need to confront him again. Properly. I mean, my investigator's not... You know, he did the best he could. He's a good guy, but he's not an attorney and he doesn't do that kind of thing. But, you know, we still didn't get the confrontation by having a CV, which is primary. This is post-Katrina, New Orleans, 18 months after Katrina. And, you know, the VA Medical Center, like every place else down there, was devastated. You know, I don't know, and Dr. Santos may be very qualified. I don't know. But I've seen his CV. I don't know if he's board certified. I don't know if he was the best qualified person yet. What was his position? He was Chief of Hematology and Oncology. Chief of Oncology. But I don't know if he was board certified or not. And part of the problem is I can't challenge him. Unless I've got something to challenge him with. You know, it very well may be that he was qualified and I could challenge him. But I don't know that. And that's, again, why we have this duty to assist. I think that's where Cushman comes in to play, where it gives us property rights and the benefits. And also Green versus McElroy, the old Supreme Court decision, comes in and says, Listen, unless some Congress has specifically said, no, this doesn't apply, then you have the rights to due process and it's incontinent. Mr. Wells, did you try other routes to find out if Dr. Santos was board certified? I did. I tried to do Internet searches and I could not find anything. Which doesn't mean he's not. I just couldn't find him. My investigator also ran a database and found out a lot about his finances. We didn't find anything to that effect. And, Your Honors, I am over time, but I was certainly willing to answer any questions that you have. Okay. Any more questions? No questions. Thank you, Mr. Wells. Thank you so much for allowing me to come here today. Sure.